**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 17-177 |
| | ) | Judge Nora Barry Fischer |
| MAURICE BOXLEY, | ) | |
| ERICK MCCOY, | ) | |

**MEMORANDUM OPINION**

I.     INTRODUCTION

In this case, Defendants Maurice Boxley ("Boxley") and Erick McCoy ("McCoy") are each charged with one count of conspiracy to possess with intent to distribute and distribution of heroin and fentanyl, in violation of 21 U.S.C. § 846, from in and around April 2016 to on or about June 12, 2017; and one count of possession with intent to distribute and distribution of heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), for conduct occurring on or about June 12, 2017.  (Docket No. 12).  Presently before the Court are motions to suppress evidence filed by the Defendants challenging warrantless seizures of evidence from them on June 12, 2017 and the Government's opposition thereto.  (Docket Nos. 128; 131; 183; 192).  The Court held a suppression hearing on August 8, 2019, the official transcript of which was filed on September 6, 2019.  (Docket Nos. 217; 228).  The Government filed its proposed findings of fact and conclusions of law on October 23, 2019, and McCoy and Boxley followed suit on October 31, 2019.  (Docket Nos. 244; 245; 246).  The parties declined to submit any responses by the Court's deadline of November 14, 2019, at which time the Court took the matter under advisement.  (Docket Nos. 218).  After careful consideration of all of the parties' filings and the credible

evidence of record, and for the following reasons, the Motions to Suppress filed by McCoy [128] and Boxley [131] are denied.

II.     BACKGROUND

a. *Factual Findings*

At the hearing, the Government presented the testimony of FBI Task Force Officer and Allegheny Port Authority Detective Lee Niebel and City of Pittsburgh Bureau of Police Narcotics and Vice Detective Justin Simoni and introduced two photographs as exhibits.   (Docket No. 228; Govt Exs. 1, 2).   Defendants did not call any witnesses and instead relied upon cross-examination of the detectives and a police report of the incident which was introduced by McCoy.   (Docket No. 228; Def. Ex. A).   In this Court's opinion, Detectives Niebel and Simoni both offered credible testimony concerning the events in question, despite efforts to impeach them.  *See United States v. Garcia,* 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 574 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'").   The detectives also presented as experienced law enforcement officers and narcotics investigators.

To this end, Detective Niebel graduated from Edinboro and served in the U.S. Army and Reserves, including two tours of duty in Iraq, prior to pursuing law enforcement as a career. (Docket No. 228 at 53-54).   He has been a law enforcement officer since 2008 and is currently a Detective with the Port Authority Police, assigned to FBI Pittsburgh's opioid task force, investigating overdoses and distribution of fentanyl and heroin since 2016.   (*Id*. at 8-9). Detective Simoni is a graduate of Indiana University of Pennsylvania and has been a Pittsburgh

Police Officer for 14 years. (*Id.* at 56-57, 73, 87). He has been a detective with the Narcotics and Vice Division for the past 10 years, participating in hundreds of drug investigations throughout that time. (*Id.* at 57). Both detectives completed the Northeast Counterdrug's Top Gun undercover narcotics investigations course and other relevant trainings for narcotics investigators including interviewing and interrogation techniques. (*Id.* at 9, 53, 57). Detective Simoni also teaches at the Pittsburgh Police Academy. (*Id.* at 57).

As to this matter, Detective Niebel served as co-case agent for the investigation of a heroin/fentanyl distribution ring led by co-defendant Kimn Booth from August of 2016 through the instant prosecution, including a June 12, 2017 operation resulting in the arrests of McCoy and Boxley at the Auto Bath House in the 5700 block of Butler Street in the City of Pittsburgh's Lawrenceville neighborhood. (Docket No. 228 at 9-10, 13, 16). Detective Simoni was not a part of the initial investigation but assisted in the June 12, 2017 operation and was involved in McCoy's arrest and the seizure of narcotics from his person. (*Id.* at 58-59, 65-66). Detective Niebel conducted the traffic stop of the gold Toyota Avalon Boxley was driving and effectuated his arrest. (*Id.* at 20, 22, 35)

Detective Niebel credibly explained how Booth operated his fentanyl/heroin distribution activities as he would set up narcotics sales with customers over the telephone, direct them to a meet location within the Pittsburgh area to make the deal, sometimes call the customer to change the location prior to the established time, and would often send a runner or another associate to effectuate the deal on his behalf. (Docket No. 228 at 9-10). He testified that law enforcement utilized a confidential human source ("CHS") to set up controlled buys of narcotics from Booth on October 1, 2016; October 25, 2016; November 25, 2016; and February 20, 2017 and that

narcotics were successfully purchased from Booth and/or his associates on each of those dates. (*Id*. at 10-16). Through their investigation, law enforcement observed that Booth and/or his runners utilized three types of vehicles when delivering the narcotics, i.e.: a gold Toyota Avalon, a black Volkswagen Touareg, and a gold Jeep Commander. (*Id*. at 6, 17). They also learned that Booth was known as "Wheezy" and that one of the runners involved in the transactions was "Dreads", an individual who was later identified as McCoy. (*Id*. at 18). Most pertinent here, McCoy delivered narcotics on behalf of Booth on October 25, 2016 to both a CHS working with law enforcement and another group of individuals who were pulled over separately by officers in the same area; the November 25, 2016 controlled buy where narcotics were delivered by co-defendant Antoine Johnson a/k/a "Tweezy" to a CHS and Detective Niebel took place at the Auto Bath House in Lawrenceville; and, during the February 20, 2017 controlled buy, law enforcement took photographs of Booth and McCoy inside the Mongolian Grill on the Southside after they sold narcotics to a CHS in the bathroom and observed them leave the area in the gold Avalon. (*See id*.; Govt. Exs. 1 and 2). Prior to June 12, 2017, law enforcement did not have any information that Boxley was involved in Booth's heroin/fentanyl distribution activities or was associated with the gold Avalon used in the prior controlled buy. (Docket No. 228 at 28-30, 33-36, 69).

As noted, law enforcement utilized a CHS to set up another controlled buy of multiple bricks of heroin/fentanyl from Booth on June 12, 2017. (Docket No. 228 at 13). During a phone call, Booth directed the CHS to the Auto Bath House in Lawrenceville on that afternoon. Detective Niebel explained that law enforcement officers from the FBI Task Force and the City of Pittsburgh Narcotics and Vice Division made an operational plan to conduct surveillance in the area, identify the delivery vehicle and conduct a "takedown" by stopping the delivery vehicle and

arresting the individuals while they were still in possession of the narcotics rather than conducting a controlled buy from them. (*Id*. at 13, 16-17). The operational plan was established at a meeting between the officers before arriving on scene and they also communicated during the operation via a group telephone conference, with the officers joining from their separate vehicles. (*Id*. at 17-19, 66-68). The detectives testified consistently that physical descriptions of Booth and "Dreads" (a/k/a McCoy) as well as the make and model of the vehicles previously used by Booth and his runners, including a gold Toyota Avalon; black Volkswagen Toureg; and, gold Jeep Commander were provided to the involved members of the FBI Task Force and Pittsburgh Police. (*Id*. at 17-19, 59-60, 86).

On the afternoon in question, numerous law enforcement officers proceeded to the vicinity of the Auto Bath House on the 5700 block of Butler Street in several different vehicles to surveil the area and execute their operational plan. (Docket No. 228 at 17-19). Detective Niebel and another task force officer were in an unmarked vehicle which was easily identifiable as a police car because it was a blue Ford Taurus equipped with emergency lights. (*Id*. at 18, 46-47). Detective Simoni was in an undercover vehicle. (*Id*. at 65). Both detectives testified that as they were driving near a parking lot on 57th Street, they observed a gold Toyota Avalon parked directly adjacent to a red pickup truck. (*Id*. at 18-19, 37-38, 48, 61-62). They also saw that there were no other vehicles in the parking lot at the time and the passenger in the gold Avalon was communicating with the driver of the truck, although they could not hear their conversation. (*Id*. at 48, 63). As he drove past this location, Detective Niebel identified "Dreads" as the passenger in the vehicle and proceeded to the traffic light at Butler Street. (*Id*. at 43-44). While he was driving separately, Detective Simoni observed the driver of the Avalon quickly look over his left

shoulder and stare directly at the unmarked police car stopped at the traffic light in a suspicious manner. (*Id.* at 50-51, 62). All of this information was communicated to the team of officers on the conference call. (*Id.* at 43-44, 86).

Detectives Niebel and Simoni testified credibility that although they did not see a hand-to-hand narcotics transaction between the two vehicles and observed them for only a short period of time, based on their experience investigating narcotics cases, they believed that a narcotics transaction had taken place between the occupants due to all of the circumstances. (*Id.* at 19-20, 63-64, 81-82). However, they candidly admitted that they did not stop the red truck and confirm their suspicions. (*Id.* at 82-83).

Shortly thereafter, the gold Avalon exited the parking lot, made a left onto Butler Street and pulled into the Auto Bath House. (Docket No. 228 at 20, 63-64). Two police vehicles were following the Avalon at the time, with Detective Niebel trailing in the second of these police vehicles. (*Id.* at 20). Speaking on the conference call, Detective Niebel directed the closer officer to pull over the Avalon and lights and sirens were activated. (*Id.*). As the Avalon slowed down, the passenger, McCoy, opened the door and fled on foot, with the car continuing for approximately 20 yards in the car wash parking lot until stopping completely. (*Id.* at 21, 35-36). McCoy ran directly into Detective Simoni, who had exited his car after parking nearby, shouting at him "Pittsburgh Police" and "Stop." (*Id.* at 65). Detective Simoni took McCoy to the ground; he was then handcuffed and arrested with the assistance of another officer. (*Id.* at 65-66). A search incident to McCoy's arrest resulted in the seizure of heroin and cash. (*Id.*). A cell phone McCoy dropped in the parking lot when he ran into Detective Simoni was also recovered. (Def. Ex. A).

After observing McCoy's flight, Detective Niebel approached the Avalon shouting commands at the driver, Boxley, to show his hands and get out of the vehicle. (Docket No. 228 at 21-22). Since the driver did not respond to these instructions, Detective Niebel opened the driver's side door and observed that Boxley was on a FaceTime call with a person whom he instantly recognized was Kimn Booth. (*Id*. at 21-22). The iPhone application also listed "Wheezy" as the contact at the top of the screen. (*Id*. at 22). Detective Niebel forcefully removed Boxley from the vehicle at which time he dropped the cell phone on the ground and Booth remained visible on the screen as the FaceTime call continued. (*Id*.). Boxley's cell phone was seized but a search incident to his arrest did not result in the seizure of any narcotics or firearms. (*Id*. at 72). Boxley also made statements to law enforcement after his arrest. (Docket No. 131-2). As is set forth in the FBI 502 Report of FBI Special Agent Leonard Piccinni:

> Maurice Boxley … was interviewed at the Auto Bath House, Lawrenceville, PA. After being advised of the identities of the interviewing Agent(s), SA Leonard Piccini Jr./TFO Christopher Mordaunt and the nature of the interview, Boxley provided the following information:
>
> Boxley advised that he works and does not know anything about drugs. Furthermore, agents would be able to locate his work clothes in his car. However, Boxley advised that the vehicle is not registered to him and he borrowed it from a female. Boxley could not recall the females name.
>
> Boxley advised that the occupant (Erick McCoy) of his vehicle asked him for a ride to go shoe shopping. Boxley referred to the occupant as his cousin. Boxley pulled into the car wash to have his car washed.
>
> When Boxley was advised that officers just observed him and his cousin meeting with individuals in a truck, Boxley concurred and advised that it was his cousin that go out of Boxley's car and not him. Furthermore, Boxley was unsure why his cousin exited

Boxley's vehicle.

(Docket No. 131-2).

Boxley and McCoy were initially charged with state offenses of possession with intent to deliver heroin; possession of heroin; and criminal conspiracy. (Def. Ex. A). Those charges were *nolle prossed* in favor of this federal prosecution.

### b. *Relevant Procedural History*

A federal grand jury returned a three-count indictment against Booth, Boxley, McCoy and Johnson on July 11, 2017. (Docket No. 12). The charges against Booth and Johnson have been fully resolved as both pled guilty and were sentenced to periods of incarceration by this Court. (Docket Nos. 91; 92; 113; 172; 174; 242). The remaining charges against Boxley and McCoy are one count of conspiracy to possess with intent to distribute heroin and fentanyl in violation of 21 U.S.C. § 846 and one count of possession with intent to distribute heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). (Docket No. 12). As noted, the Court accepted pre-hearing briefing on the motions; convened a motion hearing; secured the official transcript; and reviewed the parties' proposed findings of fact and conclusions of law. (Docket Nos. 128; 131; 183; 192; 217-218; 228; 244-246). As the motions have been fully briefed and argued, they are now ripe for disposition.

### III. LEGAL STANDARD

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (citations omitted). The trial judge is in

the best position to observe the demeanor and tone of testifying witnesses and to evaluate credibility of their testimony. *See Garcia,* 521 F. App'x at 73.

IV.    DISCUSSION

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. CONST. AMEND. IV; *see also United States v. Ubiles,* 224 F.3d 213, 216 (3d Cir. 2000). Warrantless searches and seizures are per se unreasonable subject only to a few specifically established and well delineated exceptions. *Horton v. California,* 496 U.S. 128, 133 (1990). Because no warrant authorized the searches and seizures at issue here, the burden is on the Government to prove by a preponderance of the evidence that they fell within one of the recognized exceptions to the warrant requirement. *United States v. Herrold,* 962 F.2d 1131, 1137 (3d Cir. 1992). One exception to the warrant requirement is a *Terry* stop and frisk. Generally, *Terry v. Ohio,* 392 U.S. 1 (1968), permits a police officer to conduct "a brief investigatory stop when he or she has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (citing *Terry,* 392 U.S. at 30). "Further, an officer may conduct an investigatory stop of a moving vehicle if he has reasonable suspicion that its passengers are engaged in criminal activity." *United States v. Mathurin,* 561 F.3d 170, 174 (3d Cir. 2009) (citing *Ornelas v. United States,* 517 U.S. 690, 693 (1996); and *United States v. Hensley,* 469 U.S. 221, 226-27 (1985)). A *Terry* patdown search is generally authorized after a vehicle is stopped if there is reasonable suspicion of criminal activity by the vehicle's occupants. *See United States v. Lewis,* 672 F.3d 232, 237 (3d Cir. 2012). "The automobile exception permits vehicle searches without a warrant if there is 'probable cause to believe that the vehicle contains evidence of a crime.'" *United States v. Donahue,* 764 F.3d 293, 299-300 (3d Cir. 2014) (citations omitted). The United States

9

Court of Appeals for the Third Circuit has recognized the "broad sweep of the automobile exception," pursuant to which a vehicle may be searched without a warrant upon a showing of probable cause that evidence of a crime may be located in the vehicle. *Donahue*, 764 F.3d at 300. Any evidence obtained pursuant to a search that does not meet a recognized exception to the warrant requirement must be suppressed as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)).

Boxley and McCoy argue that the June 12, 2017 investigatory stop of the vehicle in the car wash parking lot was not supported by reasonable suspicion and violated their Fourth Amendment rights. (Docket Nos. 128; 131; 190; 192; 245; 246). They seek suppression of all evidence seized by law enforcement after the allegedly illegal stop as "fruit of the poisonous tree," including the heroin, fentanyl and cash recovered from McCoy's person, statements Boxley made to law enforcement and cell phones seized from both of them. (*Id*.). The Government counters that the law enforcement officers had both reasonable suspicion and probable cause to pull over the vehicle as it entered the car wash driveway and that the corresponding searches and seizures including their arrests did not run afoul of their Fourth Amendment rights. (Docket Nos. 183; 244). After careful consideration of the totality of the circumstances, in light of the credible facts established by a preponderance of the evidence at the evidentiary hearing, the Defendants' motions to suppress will be denied.

Before addressing the sufficiency of the evidence justifying the seizures in this case, the Court must determine *when* Boxley and McCoy were seized for Fourth Amendment purposes in light of their positions that they were seized when the vehicle was pulled over at the car wash before McCoy exited the passenger door and fled on foot. *See e.g., United States v. Brown*, 765

F.3d 278, 288 (3d Cir. 2014) (citing *United States v. Torres*, 534 F.3d 207, 210 (3d Cir.2008) and *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003)) ("The initial step in our suppression analysis is to determine whether a seizure has taken place and, if so, when the seizure occurred."). The timing of the seizures is important because an individual's Fourth Amendment rights are not triggered until a seizure occurs. *See United States v. Waller*, Crim. No. 14-40, 2014 WL 4272765, at *4 (W.D. Pa. Aug. 29, 2014), *aff'd* 665 F. App'x 150 (3d Cir. 2016) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845 n. 7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment.")). The Court is also required to conduct this evaluation as to each of the Defendants independently because "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (quoting *Brown v. United States*, 411 U.S. 223, 230 (1973)).

> A seizure occurs when a police officer uses physical force to restrain a suspect or when a suspect submits to an assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *accord United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) ("for there to be a seizure, the police must apply physical force to the person being seized, or where force is absent, have the person seized submit to a show of police authority"). Such a submission to authority occurs when the suspect "manifests compliance with police orders." *United States v. Waterman*, 569 F.3d 144, 146 n. 3 (3d Cir. 2009) (citing *Couden v. Duffy*, 446 F.3d 483 (3d Cir. 2006)). In the context of a vehicular pursuit, a seizure does not occur either when police sirens are activated, or during pursuit of the suspect's vehicle. *See United States v. Sinkler*, 91 F. App'x 226, 228, 230–31 (3d Cir. 2004) (unpublished) (defendant who led police on a vehicle chase from police was not seized until after the pursuit concluded and he had been arrested).
>
> A defendant's momentary compliance with police directions does not rise to the level of a Fourth Amendment seizure if he "did not submit in any realistic sense to the officers' show of authority."

> *Valentine*, 232 F.3d at 359; *see also United States v. Grant*, 459 F. App'x 154, 156 (3d Cir. 2012) (unpublished) (defendant who momentarily raised his hands when police ordered him to "show your hands" for no more than a few seconds before fleeing was not seized); *United States v. Samuels*, 131 F. App'x 859, 862 (3d Cir. 2005) (unpublished) (defendant who raised one hand in response to officers' request to raise both his hands did not submit to police authority because he continued to make hand movements toward his waist).

*United States v. Stanton*, Crim. No. 11-57, 2012 WL 4815402, at *4 (W.D. Pa. Oct. 10, 2012), *aff'd*, 744 F. App'x 762 (3d Cir. 2018).   Simply put, a seizure does not occur until a moving vehicle comes to a complete stop and submits to the authority of the police and an individual who flees a vehicle prior to that point in time has not yet been seized.   *See e.g., United States v. Johnson*, 432 F. App'x 118, 120-121 (3d Cir. 2011) (holding that police activating sirens and lights did not constitute seizure as defendant led police on car chase, fled on foot and was not seized until he was arrested).   The Court of Appeals has also recognized that an occupant of a vehicle which has come to a complete stop following a show of authority by law enforcement has not himself submitted to law enforcement's authority if he refuses commands to get out of the vehicle and needs to be forcibly removed.   *See e.g., United States v. Waller*, 665 F. App'x 150, 152 (3d Cir. 2016) ("We agree with the government that, given his failure to submit to the police officers' show of authority, [the passenger] Waller was not seized until the officers physically removed him from the [vehicle.]").

Here, the credible facts of record demonstrate that the following events occurred in chronological order:

> (1) Boxley drove the vehicle into the car wash parking lot on his own volition;
> (2) law enforcement vehicles made a show of authority by activating

12

the sirens and lights on the two police vehicles and pursuing Boxley into the car wash parking lot;

(3) Boxley slowed the car down to a very brief stop;

(4) McCoy opened the passenger door and fled on foot running away from the pursuing law enforcement vehicles;

(5) Boxley drove the vehicle another 20 yards toward the car wash until coming to a complete stop;

(6) McCoy ran directly into Detective Simoni and he was taken to the ground; and,

(7) Detective Niebel approached the vehicle shouting commands at Boxley to show his hands and get out of the vehicle and after he did not respond, Detective Niebel opened the driver's side door of the vehicle and forcibly removed Boxley from the vehicle.

(*See* Docket No. 228 at 20-21; 35-36; 63-65). In light of these findings and the foregoing authority, the Court holds that McCoy was seized when he was brought to the ground by Detective Simoni and Boxley was seized when Detective Niebel opened the driver's side door and forcibly removed him from the vehicle. *See Johnson*, 432 F. App'x at 120-121; *see also Waller*, 665 F. App'x at 152. Therefore, the Court overrules Boxley and McCoy's positions that they were seized prior to McCoy's flight because they did not submit to the officers' show of authority at that time. The Court continues its analysis of their asserted constitutional violations with these factual findings as to the timing of their respective seizures in mind.

Boxley and McCoy next maintain that the vehicle stop was unlawful because the officers did not observe the vehicle commit a traffic violation. (Docket Nos. 128; 131; 190; 192; 245; 246). However, there is no requirement that law enforcement observe a traffic violation prior to pulling over a moving vehicle. *See United States v. Brown*, Crim. No. 15-182, 2017 WL 3593883, at *12 (W.D. Pa. Aug. 21, 2017) ("As an initial matter, there is no requirement that police must observe a motor vehicle violation prior to conducting a traffic stop."). Rather, the law is well-

settled that an investigatory stop of a moving vehicle is permitted if the officers have reasonable

suspicion that one of the vehicle's occupants is engaged in criminal activity. *See Mathurin*, 561

*F.3d at 174*.

> Reasonable suspicion, while not rigidly defined, may be the result of the following factors: "specialized knowledge and investigative inferences," "personal observation of suspicious behavior," "information from sources that prove to be reliable, and information from sources that-while unknown to the police-prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip." *Brown*, 448 F.3d at 247 (citation omitted). Depending upon the totality of the circumstances, reasonable suspicion may be the result of one or a combination of the above and other relevant factors. *Id.*

> In evaluating the officer's actions, the Court must defer to the "officer's knowledge of the nature and nuances of the type of criminal activity the officer has observed." *United States v. Robertson*, 305 F.3d 164, 166 (3d Cir. 2002) (citing *United States v. Nelson*, 284 F.3d 472 (3d Cir. 2002)). In addition, the United States Court of Appeals for the Third Circuit gives considerable deference to police officers' determinations of reasonable suspicion. *See, e.g., Nelson*, 284 F.3d at 482. Similarly, courts often defer to personal observations and conclusions on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see also* [*Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)].

> The Third Circuit has applied the so-called " 'collective knowledge doctrine'—under which the knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure, search, or arrest," *United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010), in various circumstances, including reasonable suspicion to conduct a *Terry* stop and frisk, *id.*; probable cause for a warrantless arrest, *see United States v. Belle*, 593 F.2d 487, 497, n.15 (3d Cir. 1979); and, seizures under the plain view doctrine, *see United States v. Menon*, 24 F.3d 550, 562 (3d Cir. 1994). The collective knowledge doctrine allows officers "'to act on the strength' of work done by fellow officers" when they are engaged in joint law enforcement activities. *United States v. Gonzalez,* 630 F. App'x. 157, 161 (3d Cir. 2015) (quoting *Whiteley v. Warden*, 401

U.S. 560, 568 (1971)). "Under the rule, determinations concerning the existence of reasonable suspicion can be made based on the knowledge of the officer conveying the information, not on 'whether those relying on the [information] were themselves aware of the specific facts which led their colleagues to seek their assistance.'" *Gonzalez*, 630 F. App'x. at 161 (quoting *United States v. Hensley*, 469 U.S. 221, 231 (1985)).

*United States v. Gardenhire*, Cr. No. 15-87, 2017 WL 1022578, at *4-5 (W.D. Pa. Mar. 16, 2017).

Following these principles, it is the Government's burden to demonstrate that Detective Simoni had reasonable suspicion to seize McCoy when he took him to the ground and Detective Niebel had reasonable suspicion to seize Boxley when he forcibly removed him from the vehicle. *See id.* In this Court's estimation, the totality of the circumstances supports a finding that these experienced officers had reasonable suspicion to believe that McCoy and Boxley were engaged in criminal activity prior to effectuating their seizures. *See United States v. Cortez*, 449 U.S. 411, 417-18 (1981) (A court must look to the "totality of the circumstances—the whole picture" to determine whether the officer had "particularized and objective basis for suspecting the particular person stopped of criminal activity.").

Initially, reliable information gleaned from the prior investigation of Booth's drug trafficking activities supports the finding of reasonable suspicion. *See e.g., United States v. Pete*, 463 F. App'x 113, 115-116 (3d Cir. 2012) ("the officers in this case had at least reasonable suspicion to justify stopping the car, based on the information provided to them by the confidential informant as well as their own observations and knowledge gleaned through their investigation," which included working with the confidential informant "extensively in arranging a controlled buy"); *United States v. Yokshan*, 431 F. App'x 170, 174 (3d Cir. 2011) (finding reasonable suspicion of criminal activity because "police independently corroborated statements from

15

informants, successfully executed a Controlled Buy, and had GPS information.").  To this end, the experienced officers were aware that Booth had been the subject of a months-long investigation which included at least four (4) controlled buys of illegal narcotics set up through phone calls to him, understood that he often used runners to deliver drugs on his behalf and also effectuated another seizure of narcotics from a group of customers whom were observed purchasing narcotics from one of those runners in the area near where the controlled buy took place. (Docket No. 228 at 9-18).

As to McCoy, although the detectives knew him only as "Dreads" at the time, they had reliable information that he had previously acted as a runner for Booth and delivered drugs on his behalf to a CHS during two of those controlled buys and also sold the drugs to the nearby customers. (Docket No. 228 at 13, 18-19, 37).   The prior investigation also revealed that Booth and McCoy left the most recent controlled buy in February of 2017 in a gold Toyota Avalon and they were photographed on that occasion by law enforcement such that both of their physical identities were known to law enforcement.   (*Id*. at 13-14; Govt. Exs. 1; 2).   The officers were further aware that one of the prior controlled buys took place at the Auto Bath House on the 5700 block of Butler Street in Lawrenceville, making it a known location where Booth's runners distributed narcotics.   (*Id.* at 17; *see also United States v. Edmonds*, 2013 WL 6002234, at *10 (W.D. Pa. Nov. 12, 2013), *aff'd*, 606 Fed. Appx 656 (3d Cir. 2015) ("the officers' awareness of prior crimes having occurred in the general vicinity is certainly one of the factors which must be considered in the evaluation of all of the evidence").

Beyond those facts pertaining to the prior investigation, the officers had reliable information that Booth or one of his runners would be in possession of illegal narcotics at the Auto

Bath House on the afternoon of June 12, 2017 because law enforcement used a CHS to set up another controlled buy to take place at that time and location. *See Pete*, 463 F. App'x at 115-116; *see also Yokshan*, 431 F. App'x at 174. When officers arrived in the area near the agreed-upon time, they observed a gold Toyota Avalon in a parking lot a block away from the car wash and identified "Dreads" as a passenger in that vehicle and since the vehicle and runner matched those involved in prior controlled buys from Booth, it heightened the officers' suspicion that he was in possession of narcotics to be delivered during the controlled buy. *See id.* The Court also credits the testimony of experienced narcotics detectives that they believed that "Dreads" was involved in another drug sale to occupants of a red truck because he was a known drug dealer and runner for Booth, was communicating with the occupants of the red truck, the parking lot was otherwise empty in close vicinity to the time and location of the scheduled controlled buy, and the driver, (Boxley), acted suspiciously by snapping back and staring when he saw the unmarked police vehicle drive past that location. *See e.g., Wardlow*, 528 U.S. at 124 ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *see also Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750–51, 151 L.Ed.2d 740 (2002) (the reasonable suspicion evaluation permits "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (quotation and citation omitted)). The vehicle then proceeded to the Auto Bath House and pulled into the driveway at which time law enforcement had observed a known runner for Booth, riding in a vehicle matching the description from one used in a prior controlled buy, arrive at the location of the controlled buy they had set up around the agreed-upon time the deal was scheduled to "go down." *See Pete*, 463 F. App'x at

115-116; *see also Yokshan*, 431 F. App'x at 174. At this point, the trailing officers activated lights and sirens and pursued the vehicle into the parking lot of the car wash to conduct an investigatory stop. Although a seizure had not yet taken place, the totality of the circumstances plainly establishes that the officers had reasonable suspicion that the occupants of the gold Toyota Avalon were engaged in criminal activity when the traffic stop was initiated. *See id.*

However, the facts supporting reasonable suspicion also include the Defendants' respective responses to the officers' legitimate show of authority by initiating the traffic stop with their sirens and lights activated. As the Court of Appeals has held, "flight upon noticing police, plus some other indicia of wrongdoing, can constitute reasonable suspicion." *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004). "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). To this end, McCoy fled the passenger side of the vehicle immediately after the show of authority by law enforcement, providing reasonable suspicion for the officers to seize him, as Detective Simoni did by taking him to the ground after McCoy ran directly into him. *See Bonner*, 363 F.3d at 217. Boxley continued driving the car another 20 yards until he finally stopped and did not obey Detective Niebel's commands to show his hands and get out of the vehicle, all of which certainly provided Detective Niebel reasonable suspicion to open the driver's side door, at which time he observed Boxley in an active FaceTime call with Booth and forcibly removed Boxley from the vehicle. *See Waller*, 665 F. App'x at 152. The facts that Boxley was neither a subject of the prior investigation nor known to law enforcement as a potential suspect do not undermine the Court's findings that the investigatory stop of the vehicle and his seizure were supported by reasonable suspicion. *See i.d.* (reasonable suspicion

found based on description of vehicle and location of same near a shooting); *see also United States v. Goodrich*, 450 F.3d 552, 564 (3d Cir. 2006) ("the Supreme Court has upheld a number of stops based on an officer's observation of entirely legal acts, where the acts, when viewed through the lens of a police officer's experience and combined with other circumstances, led to an articulable belief that a crime was about to be committed.").   To reiterate, Boxley arrived at the location of a controlled buy at the established time driving a vehicle matching the description of one used in prior controlled buys from Booth; was transporting one of Booth's known runners as his passenger; was observed acting suspiciously upon noticing an unmarked police vehicle such that he appeared to be serving as a lookout for a drug deal; continued to drive his car another 20 yards after McCoy fled; and refused commands to show his hands and get out of the vehicle because he was on a FaceTime call with Booth himself.   Taken together, all of these facts would lead a reasonable officer to conduct a stop for the purpose of investigating the vehicle and its occupants, including Boxley, due to their suspected involvement in distribution of illegal narcotics.   *See Mathurin*, 561 F.3d at 174.

For all of these reasons and after carefully considering the "whole picture" at issue in this criminal episode, the Court finds that the detectives had an objective and particularized basis to suspect that McCoy and Boxley were engaged in criminal activity prior to seizing them.   *See Cortez*, 449 U.S. at 417-18.   As Defendants rest their suppression arguments on an alleged lack of reasonable suspicion of the vehicle stop and seek suppression of any evidence resulting therefrom under *Wong Sun* as fruit of the poisonous tree, the Court must deny their motions to suppress.

Although the Court's analysis can end here, it will briefly address the Government's

alternative theories, as the Court agrees that given the experience of the detectives, the facts leading up to the seizures would also supply them with probable cause to seize the Defendants and search the gold Avalon. The probable cause inquiry "is entirely objective," *Halsey v. Pfeiffer*, 750 F.3d 273, 299 (3d Cir. 2014), and is "commonsense," "practical," and "nontechnical;" it is based on the totality of the circumstances and is judged by the standard of "reasonable and prudent men." *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983) (internal quotation marks and citations omitted). The Court evaluates "the events which occurred leading up to the stop or search, and then ... [decides] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to ... probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). If there was a "fair probability that contraband or evidence of a crime" would have been found, there was probable cause for the search. *Gates*, 462 U.S. at 238.

As the Court has already held, the officers had reasonable suspicion to pull over the gold Avalon after it entered the predetermined location of the controlled buy based on the totality of circumstances recounted above. Those same facts also provided them with probable cause to search the vehicle under the automobile exception because there was a fair probability that evidence of illegal narcotics trafficking would be found in the vehicle. *See United States v. Dennis*, 527 F. App'x 221, 223-24 (3d Cir. 2013) (DEA agents had probable cause to search vehicle based upon intercepted Title III recordings that defendant was to purchase drugs from a known drug dealer at a specific time and location and observed those individuals arrive and complete the deal); *see also Donahue*, 764 F.3d at 299-300 (warrantless search permitted under automobile exception upon probable cause that evidence of crime located within vehicle). But even if probable cause was not yet established, when McCoy fled the officers' attempted stop of

the vehicle, the officers' reasonable suspicion that he was engaged in possession/distribution of illegal narcotics ripened into probable cause to arrest him.  *See e.g., United States v. Laville*, 480 F.3d 187, 195 (3d Cir. 2007) (quoting *United States v. Sharpe*, 470 U.S. 675, 705, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)) (it is "well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest.").  A lawful search incident to McCoy's arrest resulted in the seizure of illegal narcotics and cash.  *See United States v. Shakir*, 616 F.3d 315, 321 (3d Cir. 2010).  Then, officers recovered a cell phone he dropped on the ground during his flight. Upon opening the door of the vehicle, Detective Niebel observed Boxley communicating via FaceTime with Booth in plain view which, when coupled with all of the facts known to this experienced officer, provided probable cause to arrest him for conspiracy and seize the cell phone.  *See e.g., United States v. Bowra*, Crim. No. 16-161, 2018 WL 1244521, at *19 (W.D. Pa. Mar. 9, 2018) (quoting *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) (per curiam) ) ("The Supreme Court has explained that '[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.'").

  For all of these reasons, the Court would alternatively hold that the law enforcement actions in conducting warrantless searches and seizures were sufficiently supported by probable cause.


V.  CONCLUSION

  Based on the foregoing, Defendants' motions to suppress (Docket Nos. 128; 131) are

denied.   An appropriate Order follows.

_s/Nora Barry Fischer_____
Nora Barry Fischer
Senior U.S. District Judge

Dated: December 13, 2019

cc/ecf: All counsel of record.

Maurice Boxley c/o Steven Townsend, Esq.

Erick McCoy c/o James Paulick, Esq.