IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal No. 17-177 |
| ) | Judge Nora Barry Fischer |
| MAURICE BOXLEY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

I.   INTRODUCTION

In this case, Defendant Maurice Boxley ("Boxley") is charged with one count of conspiracy to possess with intent to distribute and distribution of heroin and fentanyl, in violation of 21 U.S.C. § 846, from in and around April 2016 to on or about June 12, 2017; and one count of possession with intent to distribute and distribution of heroin and fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), for conduct occurring on or about June 12, 2017, at Counts 1 and 3 of the Indictment. (Docket No. 12). Each of the codefendants, Kimn Booth, Erick McCoy and Antoine Johnson pled guilty to the conspiracy charge at Count 1. (Docket Nos. 92; 174; 299). Booth and McCoy also pled guilty to the possession with intent to distribute charge at Count 3. (Docket Nos. 174; 299). Boxley has maintained his not guilty pleas and the trial of this matter has been continued until at least September 8, 2020 under Administrative Orders issued by the Chief Judge of this Court. *See In Re: Administrative Order Concerning Jury Trials and Certain Other Proceedings Related to COVID-19 Matters*, Docket Nos. 1, 7, 12 (W.D. Pa. 3/13/20; 4/16/20; 5/29/20).

Presently before the Court is the Government's Motion in Limine to Admit 404(B) Evidence, (Docket No. 280), and Boxley's Response in Opposition, (Docket No. 284). At a recent status conference, the attorneys advised that neither further briefing nor oral argument is necessary

as to the instant motion and requested that the Court rule on their written submissions. (Docket No. 297). After careful consideration of the parties' positions and for the following reasons, the Government's Motion [280] is granted, in part and denied, in part.

II.     RELEVANT FACTS

   A. *Evidence as to Conspiracy/Distribution Activities*

>       Detective [Lee] Niebel served as co-case agent for the investigation of a heroin/fentanyl distribution ring led by co-defendant Kimn Booth from August of 2016 through the instant prosecution, including a June 12, 2017 operation resulting in the arrests of McCoy and Boxley at the Auto Bath House in the 5700 block of Butler Street in the City of Pittsburgh's Lawrenceville neighborhood. (Docket No. 228 at 9-10, 13, 16). Detective [Justin] Simoni was not a part of the initial investigation but assisted in the June 12, 2017 operation and was involved in McCoy's arrest and the seizure of narcotics from his person. (*Id*. at 58-59, 65-66). Detective Niebel conducted the traffic stop of the gold Toyota Avalon Boxley was driving and effectuated his arrest. (*Id*. at 20, 22, 35).
>
>       Detective Niebel credibly explained how Booth operated his fentanyl/heroin distribution activities as he would set up narcotics sales with customers over the telephone, direct them to a meet location within the Pittsburgh area to make the deal, sometimes call the customer to change the location prior to the established time, and would often send a runner or another associate to effectuate the deal on his behalf. (Docket No. 228 at 9-10). He testified that law enforcement utilized a confidential human source ("CHS") to set up controlled buys of narcotics from Booth on October 1, 2016; October 25, 2016; November 25, 2016; and February 20, 2017 and that narcotics were successfully purchased from Booth and/or his associates on each of those dates. (*Id*. at 10-16). Through their investigation, law enforcement observed that Booth and/or his runners utilized three types of vehicles when delivering the narcotics, i.e.: a gold Toyota Avalon, a black Volkswagen Touareg, and a gold Jeep Commander. (*Id*. at 6, 17). They also learned that Booth was known as "Wheezy" and that one of the runners involved in the transactions was "Dreads", an individual who was later identified as McCoy. (*Id*. at 18). Most pertinent here, McCoy delivered narcotics on behalf of Booth on October 25, 2016 to both a CHS working with law enforcement and another group of individuals who were pulled over separately by officers in the same

area; the November 25, 2016 controlled buy where narcotics were delivered by co-defendant Antoine Johnson a/k/a "Tweezy" to a CHS and Detective Niebel took place at the Auto Bath House in Lawrenceville; and, during the February 20, 2017 controlled buy, law enforcement took photographs of Booth and McCoy inside the Mongolian Grill on the Southside after they sold narcotics to a CHS in the bathroom and observed them leave the area in the gold Avalon. (*See id*.; Govt. Exs. 1 and 2). Prior to June 12, 2017, law enforcement did not have any information that Boxley was involved in Booth's heroin/fentanyl distribution activities or was associated with the gold Avalon used in the prior controlled buy. (Docket No. 228 at 28-30, 33-36, 69).

As noted, law enforcement utilized a CHS to set up another controlled buy of multiple bricks of heroin/fentanyl from Booth on June 12, 2017. (Docket No. 228 at 13). During a phone call, Booth directed the CHS to the Auto Bath House in Lawrenceville on that afternoon. Detective Niebel explained that law enforcement officers from the FBI Task Force and the City of Pittsburgh Narcotics and Vice Division made an operational plan to conduct surveillance in the area, identify the delivery vehicle and conduct a "takedown" by stopping the delivery vehicle and arresting the individuals while they were still in possession of the narcotics rather than conducting a controlled buy from them. (*Id*. at 13, 16-17). The operational plan was established at a meeting between the officers before arriving on scene and they also communicated during the operation via a group telephone conference, with the officers joining from their separate vehicles. (*Id*. at 17-19, 66-68). The detectives testified consistently that physical descriptions of Booth and "Dreads" (a/k/a McCoy) as well as the make and model of the vehicles previously used by Booth and his runners, including a gold Toyota Avalon; black Volkswagen Toureg; and, gold Jeep Commander were provided to the involved members of the FBI Task Force and Pittsburgh Police. (*Id*. at 17-19, 59-60, 86).

On the afternoon in question, numerous law enforcement officers proceeded to the vicinity of the Auto Bath House on the 5700 block of Butler Street in several different vehicles to surveil the area and execute their operational plan. (Docket No. 228 at 17-19). Detective Niebel and another task force officer were in an unmarked vehicle which was easily identifiable as a police car because it was a blue Ford Taurus equipped with emergency lights. (*Id*. at 18, 46-47). Detective Simoni was in an undercover vehicle. (*Id*. at 65). Both detectives testified that as they were driving near a parking lot on 57th Street, they observed a gold Toyota Avalon parked directly adjacent to a red pickup truck. (*Id*. at 18-19, 37-38,

3

48, 61-62). They also saw that there were no other vehicles in the parking lot at the time and the passenger in the gold Avalon was communicating with the driver of the truck, although they could not hear their conversation. (*Id*. at 48, 63). As he drove past this location, Detective Niebel identified "Dreads" as the passenger in the vehicle and proceeded to the traffic light at Butler Street. (*Id*. at 43-44). While he was driving separately, Detective Simoni observed the driver of the Avalon quickly look over his left shoulder and stare directly at the unmarked police car stopped at the traffic light in a suspicious manner. (*Id*. at 50-51, 62). All of this information was communicated to the team of officers on the conference call. (*Id*. at 43-44, 86).

Detectives Niebel and Simoni testified credibly that although they did not see a hand-to-hand narcotics transaction between the two vehicles and observed them for only a short period of time, based on their experience investigating narcotics cases, they believed that a narcotics transaction had taken place between the occupants due to all of the circumstances. (*Id*. at 19-20, 63-64, 81-82). However, they candidly admitted that they did not stop the red truck and confirm their suspicions. (*Id*. at 82-83).

Shortly thereafter, the gold Avalon exited the parking lot, made a left onto Butler Street and pulled into the Auto Bath House. (Docket No. 228 at 20, 63-64). Two police vehicles were following the Avalon at the time, with Detective Niebel trailing in the second of these police vehicles. (*Id*. at 20). Speaking on the conference call, Detective Niebel directed the closer officer to pull over the Avalon and lights and sirens were activated. (*Id*.). As the Avalon slowed down, the passenger, McCoy, opened the door and fled on foot, with the car continuing for approximately 20 yards in the car wash parking lot until stopping completely. (*Id*. at 21, 35-36). McCoy ran directly into Detective Simoni, who had exited his car after parking nearby, shouting at him "Pittsburgh Police" and "Stop." (*Id*. at 65). Detective Simoni took McCoy to the ground; he was then handcuffed and arrested with the assistance of another officer. (*Id*. at 65-66). A search incident to McCoy's arrest resulted in the seizure of heroin and cash. (*Id*.). A cell phone McCoy dropped in the parking lot when he ran into Detective Simoni was also recovered. (Def. Ex. A).

After observing McCoy's flight, Detective Niebel approached the Avalon shouting commands at the driver, Boxley, to show his hands and get out of the vehicle. (Docket No. 228 at 21-22). Since the driver did not respond to these instructions, Detective Niebel opened the driver's side door and observed that Boxley was

4

on a FaceTime call with a person whom he instantly recognized was Kimn Booth. (*Id*. at 21-22). The iPhone application also listed "Wheezy" as the contact at the top of the screen. (*Id*. at 22). Detective Niebel forcefully removed Boxley from the vehicle at which time he dropped the cell phone on the ground and Booth remained visible on the screen as the FaceTime call continued. (*Id*.). Boxley's cell phone was seized but a search incident to his arrest did not result in the seizure of any narcotics or firearms. (*Id*. at 72).

B.     *Evidence Pertaining to Boxley's Defense*

As to Boxley's expected defense at trial, he has claimed throughout these proceedings that he had no knowledge of the drugs recovered from McCoy on June 12, 2017 and was not a party to a conspiracy with his codefendants Booth, McCoy and/or Johnson. Both Boxley and McCoy have made statements to this effect. As is set forth in the FBI 502 Report of FBI Special Agent Leonard Piccinni:

> Maurice Boxley … was interviewed at the Auto Bath House, Lawrenceville, PA [on June 12, 2017]. After being advised of the identities of the interviewing Agent(s), SA Leonard Piccini Jr./TFO Christopher Mordaunt and the nature of the interview, Boxley provided the following information:
>
> Boxley advised that he works and does not know anything about drugs. Furthermore, agents would be able to locate his work clothes in his car. However, Boxley advised that the vehicle is not registered to him and he borrowed it from a female. Boxley could not recall the female's name.
>
> Boxley advised that the occupant (Erick McCoy) of his vehicle asked him for a ride to go shoe shopping. Boxley referred to the occupant as his cousin. Boxley pulled into the car wash to have his car washed.
>
> When Boxley was advised that officers just observed him and his cousin meeting with individuals in a truck, Boxley concurred and advised that it was his cousin that got out of Boxley's car and not him. Furthermore, Boxley was unsure why his cousin exited Boxley's vehicle.

(Docket No. 131-2). McCoy stated the following in an affidavit dated February 7, 2019:

> 2. On June 12, 2017, I asked Maurice Boxley if I could pay him to to (sic) drive me from the North Side of Pittsburgh to Downtown Pittsburgh, and then back to the North Side.
>
> 3. Prior to asking Maurice Boxley to drive me Downtown I informed Mr. Boxley that the sole purpose of me going Downtown was to go to Sneaka Villa clothing store in order to purchase a particular pair of shoes. After Mr. Boxley and I arrived at the Sneaka Villa store, I discovered that they did not have the particular pair of shoes that I was looking to buy, so Mr. Boxley and I proceeded to travel back to the North Side.
>
> 4. As Mr. Boxley and I were traveling back to the North Side, without any prompting from Mr. Boxley, I asked if he could drive me to the Lawrenceville area of Pittsburgh. In response Mr. Boxley told me that he had to be at work at a certain time and that he did not want to be late. I then told Mr. Boxley that this stop in Lawrenceville would not take long, and also that I would give him an additional amount of money in addition to what I was already going to pay him for the trip.
>
> 5. On June 12, 2017, Maurice Boxley had no knowledge of any illegal or illicit activity in which I was involved, nor did Mr. Boxley have any knowledge that I was in possession of any drugs on this date.

(Docket No. 179). McCoy also stated at his recent change of plea hearing that Boxley was not involved in the conspiracy and was incarcerated for the beginning portions of the conspiracy charged in the Indictment. Specifically, McCoy said the following:

> I would like to say that when the indictment came out, Mr. Boxley was in jail. And when he came home he was only home for four or five months. And he had nothing to do with this. He wasn't a part of this investigation nor the indictment. So I feel that he should be -- he should at least -- he should at least be free because he had nothing to do with it and I'm the one taking responsibility of my own actions. And he got -- and he got a 2-year-old -- a new son out there, a 2-year-old son he didn't get to meet yet. So I just feel, like, you know, I feel bad because he was there at the wrong time and the wrong place. So I just feel, like, he should just get another chance. And I'm taking responsibility for everything I did anyways.

*See McCoy Change of Plea Hr'g Trans. 5/29/20 at 41.*

C.      *Proffered Rule 404(b) Evidence*

The Government proffers that law enforcement witnesses would testify at trial as to all of the following:

> (1)     events on January 13, 2010 when Swissvale police attempted to purchase heroin from "Weezy" aka Kimn Booth and encountered and arrested Boxley at the scene of the arranged distribution;
>
> (2) events on July 19, 2010, when Pennsylvania Attorney General Office investigators conducted a controlled purchase of heroin from "Weezy" aka Kimn Booth. Investigators used a CI to contact Booth and Boxley came to the location and delivered 200 bags of heroin for $1000. Boxley's guilty plea and conviction on September 10, 2012 on the charges arising from these facts; and,
>
> (3) events on November 16, 2010 when Pennsylvania Attorney General Office investigators conducted a controlled purchase of heroin from "Weezy" aka Kimn Booth. Investigators used a CI to contact Booth and Boxley came to the location and delivered 100 bags of heroin for $800. Boxley's guilty plea and conviction on August 10, 2012 on the charges arising from these facts.

(Docket No. 280). Boxley was not convicted of any drug offenses arising from the January 13, 2010 incident investigated by Swissvale Police. Rather, public records from the Administrative Office of Pennsylvania Courts establish that Boxley was charged with and convicted of a misdemeanor offense of resisting arrest/other law enforcement in violation of 18 Pa.C.S. § 5104. *See Comm. v. Boxley*, Crim. No. CP-002-CR-0003247-2010 (C.P. Allghy Aug. 24, 2010), *available at:* https://ujsportal.pacourts.us/DocketSheets/MDJReport.ashx?docketNumber=MJ-05214-CR-0001352-2011&dnh=eSlqs5RBO1PY4zpYPkESXg%3d%3d (last visited 6/2/2020).

III.    LEGAL STANDARD

Evidence of a criminal defendant's conduct which is not charged in the indictment, including crimes, wrongs or other acts, may be admissible if: (1) the evidence is intrinsic to the charged offense; or, (2) the evidence is extrinsic to the charged offense but is offered for a proper

purpose under Rule 404(b).  *See United States v. Green*, 617 F.3d 233, 249 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 363, 178 L. Ed. 2d 234 (2010); *United States v. Williams*, 647 F. App'x. 144, 147 (3d Cir. 2016) (same).  In the Third Circuit, uncharged acts are considered intrinsic to the charged offense if such acts "directly prove" the charged offense, or are "performed contemporaneously with the charged crime" and "facilitate the commission of the charged crime." *Id.* at 248-49.  This type of evidence is admissible without the need for the government to provide notice to the defense prior to trial or for the Court to provide limiting instructions to the jurors during trial.  *Id.*  Uncharged acts which do not come within this definition of intrinsic evidence constitute extrinsic evidence and must meet the requirements of Rule 404(b) prior to being admitted at trial.  Rule 404(b) bars "the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character." *Huddleston v. United States,* 485 U.S. 681, 685, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

> Rule 404(b) provides, in pertinent part, that:
>
>> (b) Crimes, Wrongs, or Other Acts.
>> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>> (2) Permitted Uses … This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.
>
> FED. R. EVID. 404(b).  As the Court of Appeals articulated:
>
>> [b]ecause Rule 404(b) is a rule of general exclusion, the party seeking to admit other-acts evidence has "the burden of demonstrating [the evidence's] applicability." [*United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014)]. Admissibility under Rule 404(b) requires the satisfaction of four distinct steps: (1) the other-acts evidence must be proffered for a non-propensity purpose; (2) that evidence must be relevant to the identified non-propensity purpose; (3) its probative value must not be substantially outweighed by its potential for causing unfair prejudice to the

8

>  defendant; and (4) if requested, the other-acts evidence must be accompanied by a limiting instruction. *See Huddleston v. United States*, 485 U.S. 681, 691, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *Caldwell*, 760 F.3d at 277–78.

*United States v. Repak*, 852 F.3d 230, 241 (3d Cir. 2017).

IV.  DISCUSSION

At the outset, the Court notes that the proffered Rule 404(b) evidence concerns activities taking place in 2010 several years prior to the commencement of the charged offenses which allegedly occurred from April 2016 until June 12, 2017 and is therefore not admissible as intrinsic evidence in this matter. *See Green*, 617 F.3d at 249. Hence, the Court must evaluate the parties' arguments as to the evidence to determine its admissibility under Rule 404(b) and the applicable Third Circuit precedent noted above. To this end, the Government maintains that Boxley's 2010 activities wherein he purportedly acted as a runner for Booth on three separate occasions are tendered for the non-propensity purposes to show the existence of the conspiracy and prior relationship of the conspirators and is otherwise relevant to Boxley's motive, planning, intent, opportunity and/or knowledge of Booth's heroin distribution activities. (Docket No. 280). Boxley counters that the Government's laundry-list approach citing numerous alleged purposes has been frowned upon by Courts and that the Government has not done enough to establish the necessary evidentiary link between the prior incidents and the instant offenses. (Docket No. 284). Boxley alternatively contends that to the extent that the Court finds the prior incidents to be relevant for any of the above-stated purposes, that the admission of the proffered evidence is highly prejudicial and outweighed by the other factors under Rule 403. (*Id*.). Having considered the parties' positions in light of the governing legal standards, the Government's motion will be granted, in part, and denied, in part.

In this Court's estimation, the Government has met its burden to establish that the proffered evidence of the July and November 2010 incidents resulting in Boxley's state convictions for distribution of heroin is admissible under Rule 404(b) but the evidence of the January 2010 incident will be excluded from trial. *See Repak*, 852 F.3d at 241. Turning to the relevant factors noted above, the Government has proffered such evidence for the following non-propensity purposes:

- establishing the prior relationship between Boxley and Booth, as Boxley previously served as a runner in Booth's heroin distribution activities in 2010;

- Boxley's knowledge of heroin and how it is distributed including Booth's use of runners to effectuate heroin sales he (Booth) had set up with buyers;

- Boxley's intent on June 12, 2017 when he drove McCoy to the Auto Bath House at the time of the controlled buy law enforcement had set up with Booth and McCoy was arrested after fleeing police and heroin/fentanyl was seized from him; and,

- to counter Boxley's anticipated defense that he did not know that McCoy was distributing heroin/fentanyl for Booth on June 12, 2017 or that he (Boxley) was driving him (McCoy) around to distribute narcotics.

(Docket No. 280). The evidence of the July and November 2010 episodes and Boxley's resulting convictions for heroin distribution on those occasions are relevant to the stated purposes and significantly probative of same such that the value of such evidence is not substantially outweighed by any inherent danger of unfair prejudice to the defense. *See e.g., United States v. Gardner*, --- F.3d ----, 2020 WL 2786834, at *6 (3d Cir. May 29, 2020) (affirming conviction and declining to "overturn our precedent that a conviction makes 'the defendant's knowledge of the presence of heroin more probable than it would have been without the evidence as it indicates that he had knowledge of [the drug trade], thus making it less likely that he was at the wrong place at the

10

wrong time'"). While Boxley points out that the prior convictions were not for conspiracy but distribution offenses, he is also charged with one count of possession with intent to distribute heroin/fentanyl on June 12, 2017 to which the prior distribution offenses are clearly relevant. (Docket No. 284).

As the Court of Appeals has explained:

> [w]e have, in the past, upheld the introduction of evidence of past distribution as relevant to prove knowledge of the same or different drug in a later distribution trial. *See United States v. Givan*, 320 F.3d 452, 461 (3d Cir. 2003) ("The evidence that Givan had been convicted of distribution of cocaine makes Givan's knowledge of the presence of the heroin more probable than it would have been without the evidence."). We have also held that a defendant's "participation in a prior drug conspiracy is probative of his knowledge of, and relationship with a member of, a later drug conspiracy." *United States v. Vega*, 285 F.3d 256, 263 (3d Cir. 2002). And we have held that evidence of past distribution is relevant to prove intent to distribute in a later distribution trial, even to the extent of admitting prior convictions as well as uncharged conduct. *See United States v. Lee*, 573 F.3d 155, 166–67 (3d Cir. 2009) (holding that prior drug trafficking conviction was admissible to prove intent to distribute).
>
> Moreover, we have held that the Government has some latitude to introduce 404(b) evidence to "allow[ ] the jury to understand the circumstances surrounding the charged crime." *Green*, 617 F.3d at 247; *see also United States v. O'Leary*, 739 F.2d 135, 136 (3d Cir. 1984) (agreeing with the Government that the need "to show the background of the charges [and] the parties' familiarity with one another" were purposes under Rule 404(b) (quotation marks omitted)); *United States v. Simmons*, 679 F.2d 1042, 1050 (3d Cir. 1982) (concluding that providing the jury with "necessary background information" was a proper purpose under Rule 404(b)). Jackson's strategy at trial was to suggest that the two testifying witnesses attempted to pin everything on him so as to limit their criminal exposure; the Government was entitled to explain the relationship that Jackson had with those witnesses to provide context to their testimony. Also, because the full amount of cocaine was never recovered, the Government was within its rights to explore the escalating quantities to provide circumstantial evidence

>that Jackson was dealing with a relatively large weight on this occasion.

*United States v. Jackson*, 619 F. App'x 189, 193–94 (3d Cir. 2015). Other Third Circuit decisions have reached similar conclusions, allowing evidence of prior drug trafficking activities with alleged coconspirators to be admitted for similar purposes. *See e.g., United States v. Washington*, 602 F. App'x 858, 862 (3d Cir. 2015) (affirming admission of prior drug dealings between defendant and coconspirator so that government could "attempt to prove a continuing relationship between the conspirators."); *United States v. Duncan*, 615 F. App'x 726, 732 (3d Cir. 2015) ("Washington's testimony framed the relationship among himself, Green, and Duncan. Washington testified that he and Duncan purchased large quantities of powder cocaine, which they then cooked into crack cocaine and subsequently provided to Green to sell directly to customers, including Allen. The District Court did not abuse its discretion in finding the evidence was relevant to show Duncan's relationship to Washington, a fellow drug supplier, and Green, one of Duncan's distributors."). The evidence of the prior drug dealing between Boxley and Booth is also relevant to the extent that Boxley claims that he was driving McCoy around Pittsburgh (and communicating with Booth on FaceTime during their arrests) due to their familial relationships rather than to distribute illegal narcotics. *See also United States v. Gardenhire*, Cr. No. 15-87, 2017 WL 1355151, at *6 (W.D. Pa. Apr. 13, 2017) (evidence of prior drug trafficking with coconspirator was "relevant to refute Lance Gardenhire's expected claim that he was either unaware of the drug distribution activities of other members of the conspiracy or that his mere association with those individuals or knowledge of their activities would not be sufficient to form a conspiratorial agreement.").

At the same time, the Court does not believe that the January 2010 episode is relevant because the facts of such events are distinct from the instant charges. On that occasion, law

enforcement attempted to set up a controlled buy from Booth and Boxley arrived on scene, but he apparently did not have any drugs on him and was charged with and convicted of resisting arrest. (*See* Docket No. 280). Since no drug deal took place, the evidentiary link between prior distribution activities and the current charges is lacking. *See e.g., Garner*, 2020 WL 2786834, at *5-6 (noting that evidence of prior conviction for possession of narcotics not relevant in trial of distribution charges). Such evidence is also cumulative to the extent that it is proffered for the purpose of establishing the prior relationship between Booth and Boxley which the jury will also hear as part of the Government's presentation of the July and November 2010 events and corresponding convictions. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

Boxley further maintains that his prior convictions should be excluded under Rule 403 balancing because the July and November 2010 incidents are too old to be probative of his alleged conduct in 2017. (Docket No. 284). The Court disagrees that the age of the convictions undermines the relevance of the evidence, for the reasons already expressed. Such ruling is also consistent with the Court of Appeals recent decision in *Garner*, which expressly rejected the defendant's position that his 2006 distribution conviction was irrelevant to the 2016 possession with intent to distribute charges. *See Garner*, 2020 WL 2786834, at *6 (affirming admission of evidence and overruling defendant's argument that "his 2007 drug trafficking conviction dealt with different facts than those present in this appeal and occurred too long ago to be admissible.").

Having carefully considered all of the relevant factors outlined above, the Court concludes that the evidence of the July and November 2010 incidents and resulting convictions are admissible

under Rules 404(b) and 403, subject to a limiting instruction to be provided to the jury. *See Repak*, 852 F.3d at 241. The Court will direct the parties to meet and confer and to submit a proposed joint limiting instruction by the deadline for the submission of joint jury instructions, which will be reestablished upon further order of court.

V. CONCLUSION

Based on the foregoing, the Government's Motion [280] is granted, in part, and denied, in part. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Date: June 5, 2020
cc/ecf: All counsel of record
  Maurice Boxley c/o Steven Townsend, Esq.